**Mrs. DOE, Individually and Next Friend of Jane Doe, a Minor, Plaintiff,**

v.

**S & S CONSOLIDATED I.S.D., Joe Wardell, and Missy Imbert, Defendants.**

No. 4:99CV00238.

United States District Court, E.D. Texas, Sherman Division.

June 26, 2001.

---

**6.** This court would reach this determination even if the court had considered the stricken affidavit from Dr. Jo P. Wilson.

Hermon L. Veness, Jr. of Henslee, Flower, Hepworth & Schwartz, PLLC, Dallas, TX, for Defendants.

## *MEMORANDUM OPINION AND ORDER.*

PAUL N. BROWN, District Judge.

At its root, this case is about whether S & S Consolidated I.S.D.'s ("SS CISD"), Joe Wardell's ("Wardell"), and Missy Imbert's ("Imbert") (together, the "Defendants") treatment of an emotionally disturbed elementary school student—Jane Doe—violated the student's constitutional rights. Specifically, Mrs. Doe, individually and as next friend of Jane Doe, charges the Defendants with having violated Jane Doe's substantive due process rights by wrapping her in a blanket in order to restrain her during behavioral disturbances. Having considered the arguments of all parties and their evidence, this Court has concluded that, under the circumstances of this case, the acts Mrs. Doe has alleged do not make for a violation of such rights. The Court has also determined that Mrs. Doe's related state and federal claims fail as a matter of law.

## I. INTRODUCTION.

To properly understand that the Defendants' treatment of Jane Doe has not violated the law, it is necessary to say a bit about Jane Doe's home life and behavior. It is undisputed that such life was not ideal. Indeed, Mrs. Doe acknowledges that prior to attending school, Jane Doe was sexually abused by one of her former boyfriends. According to Mrs. Doe, Jane Doe reported that the boyfriend "had made her touch him" and "made her kiss it." (Defs.' Mot. Summ. J. Supporting Br., Ex. C at 97, 103.) Jane Doe apparently endured abuse at the hands of family

Lori Watson of the Law Offices of Wendle Turley, P.C., Dallas, TX, for Plaintiff.

members too.[1] Possibly due to the abuse she suffered, Jane Doe behaved violently and suicidally at home. Testimony from Mrs. Doe confirms such behavior:

> She was depressed. She wasn't sleeping and she wasn't eating. She would lay out in the road and tell people to drive by. She wouldn't move.

(Defs.' Mot. Summ. J. Supporting Br., Ex. C at 50.)

> [S]he became very explosive, and she was screaming. The neighbors down the road could hear her screaming ... she was screaming that loud[ly].

(Defs.' Mot. Summ. J. Supporting Br., Ex. C at 53.)

> She wouldn't go to sleep until 3:00 or 4 o'clock in the morning. And it was hard to watch her because I would find her out in the yard. She would just sneak out.

(Defs.' Mot. Summ. J. Supporting Br., Ex. C at 54.)

> [S]he would bite herself. She would threaten to jump up on the house and jump off the house, hang herself.

(Defs.' Mot. Summ. J. Supporting Br., Ex. C at 88.)

Jane Doe's state was so troublesome that she experienced two hospitalizations during her 1997 and 1998 summers outside of school. During her first ten-day stay, hospital personnel advised Mrs. Doe that Jane Doe needed *long-term hospitalization*, but Mrs. Doe rejected their advice. Perhaps predictably then, Jane Doe experienced a second hospital visit (for two weeks). As a precursor to this second visit, Doe had been hitting her mother and stating that she hated everyone including herself. Actually, Mrs. Doe admits that: "[Before the second hospital visit] ... she had come up from behind me and had a knife and stuck it to her chest ... I said what are you doing?.... [She said,] 'I just don't care, Mother. I just don't care.'" (Defs.' Mot. Summ. J. Supporting Br., Ex. C at 85.)

It is not clear how much of Jane Doe's troubles school officials understood when she entered kindergarten at SS CISD's Sadler Elementary School. Mrs. Doe insists that the school was aware by mid-October 1998 that Jane Doe had been diagnosed as Bi-polar.[2] The deposition testimony Mrs. Doe cites as an admission of this indicates only that Imbert vaguely acknowledges receiving some materials on Bi-polar disorder from Mrs. Doe around mid-October. Imbert states that she thinks she received the materials roughly at the same time Mrs. Doe requested information on testing Jane Doe for Bi-polar disorder. Mrs. Doe also insists, and Imbert confirms, that SS CISD knew Jane Doe had been Post Traumatic Syndrome diagnosed by December 3, 1998. The SS CISD's general position is that "[s]chool personnel were not ... fully aware of Jane Doe's severe emotional problems [during the 1998–99 school year]." (Defs. Mot. Summ. J. Supporting Br. at 6.) Regardless of this, the school did not advance Jane Doe to the first grade for the 1997–98 school year. She finally entered first grade in the 1998–99 academic year, and the SS CISD's awareness of and efforts to

---

1. For instance, Jane Doe's cousin apparently taught her to masturbate.

2. One therapist who has treated Doe, Dr. Stuart Samson, has "accepted the [B]i[-]polar diagnosis for want of anything that more closely describes her condition." (Pls.' Resp. Br. Supporting Documents Defs. Mot. Summ. J., Ex. C at 11.) He describes Bi-polar disorder as involving "manic behavior followed by depressive behavior." *Id.* at 12. The Court notes this for informational purposes as Dr. Samson has not been designated as an expert and thus his role as a witness is limited.

deal with Jane Doe's problems indisputably intensified.

Jane Doe's first-grade teacher, Ms. Connie Mitchusson, recorded "difficulties" Jane Doe began to have in class at the start of such academic year. SS CISD presents Jane Doe's difficulties to the Court by her teacher's sworn affidavit submitting documentation of incidents occurring on November 6 and December 1 and 2. These incidents allegedly included Jane Doe's writing on furniture, making paper messes in the classroom and not cleaning them up, cutting her tongue with scissors, defying the teacher, shouting curse words at her teacher, "exposing" herself to her teacher and fellow students, refusing to do schoolwork, and accosting other students.

November 9, 1998 marks the first major single incident, however, underlying Mrs. Doe's allegations in this case. On that date, SS CISD asserts that after being sent to in-school-suspension at SS CISD's high school for her behavior on November 6, Doe became "noncompliant" and then began being "rageful." SS CISD describes Jane Doe's behavior as including the screaming of obscenities not to be expected from an average first grader and hitting even Mrs. Doe upon her arrival at the school. Mrs. Doe retorts that two women "sat" on Jane Doe until she got there and was able to get the women off of Jane Doe. She does agree that even as she tried to calm Jane Doe down, "she just went out of control, and she hit [Mrs. Doe] in the mouth with her head and busted

[Mrs. Doe's] mouth." [3] (Defs. Mot. Summ. J. Supporting Br., Ex.C at 133.) An ambulance came and Jane Doe was transferred from one hospital to a second one at which she was admitted. Then, Mrs. Doe removed Jane Doe to another hospital that did not admit her. She was finally admitted to a fourth hospital. Medical personnel associated with all four hospitals used restraints on Jane Doe, because, as Mrs. Doe admits, Jane Doe "raged" for much of the journey from hospital to hospital.

Jane Doe's return to SS CISD marks the next major milestone in this case. Upon her return after Thanksgiving, she allegedly behaved in a manner described by Ms. Mitchusson as "out-of-control." The Court has noted the general parameters of this supposed behavior *supra.*[4] Thus, on December 1, 1998, Mitchusson says she sent Jane Doe to Principal Imbert's office. Imbert in turn escorted Jane Doe to school counselor Tim Kemp's office. While in Kemp's office, Jane Doe reportedly began throwing things, yelling, and kicking. Kemp says he had to hold her after she picked up a paperclip and began to contort it such that he feared she would stab herself or someone else. As he held her, Kemp reports that she spat at him, yelled curse words at him, and managed to "head-butt" him.[5] Kemp states and Imbert agrees that when Imbert entered the room and saw what was happening, she suggested that Jane Doe be "wrapped" in a sheet or blanket for her's and others'

3. She has also testified that Jane Doe said she would "never behave" shortly before going to the in-school-suspension.

4. Ms. Mitchusson noted Jane Doe shouting at her in front of her classmates on this particular occasion: "I'm not going to do that, B* * * *, No, F* * * * * * B* * * *, I'm not going to do that F* * * * * * work, A* * * * * *, Kiss my D* * *...." (Defs.' Mot. Summ. J. Supporting Br., Ex. F.)

5. Among other things, Imbert reports seeing spit all over Kemp and hearing Jane Doe yell things like: "Suck my D* * *, Mother F* * * * * and F* * * you B* * * *." Imbert further reports that she was worried other children could hear such outbursts. (Defs.' Mot. Summ. J. Supporting Br., Ex. A at 206.)

safety. Apparently, she recalled a colleague's description of the technique. SS CISD claims that because Jane Doe repeatedly broke out of her wrap, school personnel found it necessary to at first safety pin and then duct tape the wrap around Doe. According to Kemp, Jane Doe continued to spit and yell obscenities after being wrapped. SS CISD admits that Imbert tried to shut Jane Doe's mouth by taping gauze or placing bandages over it.

Given Jane Doe's behavior, school officials, her mother, and others understandably convened to craft methods to manage such behavior and educate Jane Doe. Specifically, on December 3, 1998, they engaged in an ARD (Admission, Review & Dismissal) Committee meeting.[6] SS CISD Superintendent Wardell was present at the ARD meeting. At such meeting, the parties reviewed a psychological report and "Comprehensive Individualized Assessment" for Jane Doe. Based in part on these materials, the group "developed an education plan ... as well as a behavior management plan." (Defs.' Mot. Summ. J. Supporting Br. at 10.) SS CISD points to notes from the meeting that indicate wrapping Jane Doe was discussed as a strategy to deal with Jane Doe. While it is not clear whether Mrs. Doe denies this, it does appear that she denies having approved of such technique. Moreover, Mrs. Doe insists, and others seem to corroborate, that she certainly never knew or agreed that tape or other devices might be used with a wrap. Wardell insists that he believed everyone attending understood wrapping might be used if necessary; he does not address the taping aspect. Imbert recalled no discussion of taping. SS CISD also points to Mrs. Doe having signed a document relating to the ARD meeting as proof of Mrs. Doe's assent to wrapping

(again not necessarily involving tape). The Court does not believe the issue to be so clear. Finally, the ARD meeting apparently resulted in the hiring of Elena McCollum, a special education teacher, at the end of 1998 to aid in Jane Doe's education.

Mid–January 1999 signals the first major turbulence in Jane Doe's schooling after the ARD meeting. Around January 19, 1999, several school personnel attended a professional training session of some sort on restraining children. Mrs. Doe presents evidence that Jane Doe was wrapped with tape on that date. All parties also discuss an incident that occurred on January 20, 1999. It is not clear whether the January 19 incident is the same as this January 20 incident. At any rate, on January 20, SS CISD asserts that Jane Doe was once again out of control; she was "really raging." SS CISD claims school personnel were unable to calm Jane Doe on this occasion. SS CISD insists Jane Doe had to be wrapped again and notes that tape was used to secure the sheet. Then, Jane Doe was apparently released to go to the bathroom but locked herself inside. Upon a janitor's opening the door, she reportedly exposed herself to him and "raged" again. Thus, the district insists she had to be wrapped again. Imbert reports that she called Mrs. Doe to come and get Jane Doe but Mrs. Doe stated she could not come and acknowledged Imbert's statement to her that Jane Doe would have to be wrapped. This time she was fastened in her wrap to a cot with tape. That is, she was wrapped, placed on a cot in the wrap, and then tape was strung around the wrapped Jane Doe and the cot in various places. SS CISD says the cot was introduced for Jane Doe's safety—it was allegedly used so she could not move around

---

6. The Individuals with Disabilities Education Act creates a regime requiring ARD meetings relating to special education students. *See* 20 U.S.C. § 1400 *et. seq.*

and hurt herself. She had reportedly bumped her head before going to the bathroom.

The January 20 incident prompted more meetings and concerns about Jane Doe's situation. At one meeting, Mrs. Doe claims that the attendees, including Mrs. Doe, school psychologists, and others decided to try to reintroduce Jane Doe to a regular classroom setting from which she had apparently been removed. This was not an ARD meeting though district officials admit such decisions would typically be made at an ARD meeting. Also, Mrs. Doe notes via Imbert's deposition testimony that at a January 20 meeting, possibly the same one where the decision to reintroduce Jane Doe to the classroom was taken, school personnel decided they should not wrap Jane Doe anymore but instead place her in a "timeout" room.

Perhaps most significantly according to Mrs. Doe's view of January 20, she reports that Imbert had called the Texas Department of Protective and Regulatory Services (called "CPS" by the parties and now the Court) to discuss Jane Doe. Imbert described Jane Doe as out of control, emotionally disturbed, on medication, and poised to hurt someone. The CPS person Imbert spoke to, Kristy Douglas, reports that she advised Imbert that "the school did not need to be wrapping the child or taping her to a bed." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J., Ex. E at 37.) She also testifies that she advised Wardell that "the school should not wrap or tape [Jane Doe] anymore." Id. at 54. Both Imbert and Wardell's deposition testimony indicates they understood that CPS was concerned by and could not "endorse" the wrapping.

Dr. Stuart Samson, a therapist who has treated Jane Doe, figures into the events of January 20 and beyond. Samson has testified that he got a call from Imbert on that day in which he said that wrapping a child in a sheet was "better than allowing the child to bang herself off the walls." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J., Ex. C at 15.) Samson testified, however, that he had no idea that SS CISD was using tape to keep sheets on Jane Doe or that Jane Doe had been fastened to a cot. Further, he reports that he knew nothing about the use of safety pins or gags. Samson thus indicates that he did not approve of or suggest such methods to Imbert. While SS CISD does assert reliance on Samson's endorsement of the wrapping technique, it does not refute Samson's statements as to the details of such endorsement. The Court notes, however, that Samson also testified that someone not having expertise on this issue "would not necessarily know[ ] . . ." "the rules and regulations that go with restraint." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J., Ex. C at 16.)

Unfortunately for all the parties concerned, January 20, 1999, was not the last time Jane Doe was wrapped. On January 22, 1999, SS CISD claims that Jane Doe was once again out of control and had to be wrapped. Specifically, SS CISD asserts that because Jane Doe became difficult, she was placed in timeout, and trouble then began. Mrs. Doe notes that she was so placed without any other person in the room, but her special education teacher testifies that Jane Doe was not alone at the start of the timeout. The teacher states that Doe was initially to remain in timeout for only five minutes. Because she refused to go back to class and reportedly showed signs of becoming "destructive," she was returned to timeout alone for what was to be a thirty minute stay. The district then offers that: "During [this thirty minute period,] . . . [Jane Doe] was spitting, hitting, biting, cursing, kicking,

and scratching." (Defs.' Mot. Summ. J. Supporting Br., Ex. J at 2.) The district claims Jane Doe was trying to destroy property in the room as well as attempting to stick her fingers into electrical sockets. School personnel called Mrs. Doe and told her Jane Doe had to be wrapped; Mrs. Doe supposedly did not object. While district personnel first tried to hold Jane Doe in a fashion described by Imbert as a "two-man hold," she reportedly resisted mightily.

Once again SS CISD contends the use of a cot and tape was needed as a safety measure. Mrs. Doe claims the two-person hold was used on Jane Doe even as she said that her arm hurt. SS CISD personnel agree she so said, but that her resistance caused any pain and suggest that was part of the reason they decided to wrap her instead.[7] Mrs. Doe also retorts that Jane Doe was left alone tied to her cot, and that when she arrived at the school to pick up her child, she had difficulty removing the tape used to hold the wrapped Jane Doe to the cot. After this incident, Mrs. Doe removed Jane Doe from SS CISD until May 1999 at which time she returned; she has apparently undergone no wrapping since her return.

Apart from any disagreements as to the chronology set forth *supra*, the parties do differ on some details as well as placing emphasis on different matters. For instance, numerous school personnel have testified that the wrapping incidents were not meant to punish Jane Doe, but, rather intended to calm her and protect her and those around her. In opposition to this, Mrs. Doe has interposed stray comments by Jane Doe and others weakly suggesting the wrappings were punishment for Jane Doe's failure to do schoolwork.[8] Mrs. Doe also asserts that the wrappings took place in the context of a lack of policies regarding their use. She points to Imbert's and Wardell's admission that they were not aware of any school or school district policies on wrapping students. Imbert and Wardell have also acknowledged there was no school district policy on the use of "timeout" rooms or periods.[9] Finally as to the wrappings, Mrs. Doe has submitted Wardell's testimony that indicates Wardell was kept abreast of Jane Doe's situation at a relatively detailed level contemporaneously with the incidents. Wardell in turn informed the SS CISD School Board of Trustees as the Jane Doe incidents occurred.

In addition to focusing on the wrappings, Mrs. Doe complains that Jane Doe did not receive adequate educational support in SS CISD. She cites Imbert's testimony for the proposition that Jane Doe did not receive direct individualized instruction from her special education teacher though Doe was classified as a special education student; the cited testimony is unclear as to the extent of Doe's interaction with the special education teacher. Mrs. Doe also asserts that she asked for alternative schooling arrangements after she removed Jane Doe, because Jane Doe did not wish to return to the same school. In fact, Wardell to some extent concedes the point. District officials also confess that they never investigated whether it would be better for Jane Doe to attend a

---

7. She reportedly tried to bite, spit at, and even kick her restrainers.

8. The Court more fully discusses the punishment issue in Section III.A.1.ii. of this opinion and order.

9. Wardell also states that apart from sending students to in-school suspension at SS CISD's high school, only Sadler Elementary utilizes a timeout room. Imbert admits the timeout room was solely for Jane Doe.

school other than the one at which she was taped and wrapped.

Jane Doe's schooling has been sporadic since the January 22, 1999 incident. Imbert admits that from January 22, 1999 through May 1999, Jane Doe received no schooling from SS CISD. She notes that Jane Doe received two hours of instruction a day from a Sadler Elementary School second grade teacher after regular school hours from May 1999 through January 2000 and that Jane Doe has since received four hours a day (apparently during regular school hours). Wardell acknowledges that he did not investigate whether two hours outside of school was sufficient for the May 1999 to January 2000 period but suggests this was at Mrs. Doe's request. Imbert admits that while Doe is ostensibly in the second grade, she has never passed the first grade.

Based on the conditions and events discussed *supra*, Mrs. Doe filed an Original Petition in state court on or about September 8, 1999. Defendants removed the case to this Court, and Mrs. Doe then filed her First Amended Original Complaint in this Court. She has since filed a Second Amended Original Complaint containing her present claims. Unfortunately, Mrs. Doe is not clear as to which specific statutory or constitutional claims she alleges

against each of the specific Defendants. As best the Court can discern, she makes the following claims: claims that all the Defendants intentionally inflicted emotional distress on Jane Doe, claims through 42 U.S.C. § 1983 that all the Defendants violated Jane Doe's Fourteenth Amendment rights to bodily integrity and security and her Fourth Amendment rights to be free from unreasonable searches and seizures, claims that all the Defendants failed in their *in loco parentis* capacities, a claim under the Individuals with Disabilities Education Act ("IDEA") that the district failed to "reach out and ... provide Jane Doe with appropriate education and counseling and assistance,"[10] claims that Imbert and Wardell failed to report the abuse of Jane Doe, claims that Imbert and Wardell negligently inflicted pain upon Jane Doe, and a claim that Imbert used excessive force against Jane Doe in violation of the Texas Education Code.[11]

## II. SUMMARY JUDGMENT STANDARD.

The granting of summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial court must

---

10. Defendants' briefing assumes this claim, but, as the Court makes clear in Section III.C. of this opinion and order, the matter is not certain.

11. Actually, Defendants' briefing suggests that Mrs. Doe's paragraphs alleging failures of *in loco parentis* duties under the Restatement of Torts are meant to bolster Mrs. Doe's § 1983 claims. Specifically, Defendants suggest the paragraphs are meant to argue deliberate indifference to Jane Doe's welfare and rights. Defendants' briefing also suggests the paragraphs in Mrs. Doe's complaint alleging failures to prevent and report abuse too are part of her § 1983 allegations. Finally, Mrs. Doe's Second Amended Original Complaint contains paragraphs in her sections stating her claims against Imbert and Wardell that allege Imbert and Wardell "maintained [themselves] in ... position[s] of trust, confidence and authority ... and negligently used [such] trust, confidence, and authority to inflict pain on Jane Doe." As with the *in loco parentis* and failure to report abuse claims, the Court is not sure how Mrs. Doe meant to utilize these paragraphs. In order not to deny Mrs. Doe any claims she may have intended to bring, the Court has assumed she has alleged separate *in loco parentis*, failure to report abuse, and negligent infliction of pain claims in addition to using such charges to bolster or inform her § 1983 or other claims.

resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enter. v. American Hardware Mut. Ins.*, 655 F.2d 598, 602 (5th Cir.1981) (citations omitted). The party seeking summary judgment carries the burden of initially demonstrating the absence of a genuine issue concerning any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party can satisfy its burden by simply "pointing out to the district court ... an absence of evidence to support the nonmoving party's case." *Id.*

Federal Rule of Civil Procedure 56 does not impose a duty on a district court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir.1996) (citations omitted). Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Such nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994) (citation omitted). Moreover, in designating specific facts, the nonmovant must " 'go beyond the pleadings' " and use " 'his own affidavits, ... deposition[s], answers to interrogatories, and admissions on file.' " *Jones v. Sheehan & Young Culp,*

PC, 82 F.3d 1334, 1338 (5th Cir.1996) (citation omitted).[12]

If the nonmovant fails to set forth specific facts to support an essential element in that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Even if the nonmovant brings forth evidence in support of its claim, summary judgment will be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

### III. ANALYSIS.

### A. Claims Against Missy Imbert.

#### 1. Section 1983 and Imbert's Alleged Constitutional Rights Violations.

Mrs. Doe asserts that Imbert was consciously indifferent to Jane Doe's "rights, welfare, and safety," Pls.' Second Am. Original Compl. at 6, and that:

> [Imbert], along with ... staff pursuant to her directives ..., on multiple occasions wrapped Jane Doe in sheets, duct-taped [her] mouth shut, duct-taped her face down to a ... cot and left the room, and placed Jane Doe in inappropriate isolation.

(Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J. at 1.)[13] Mrs. Doe

---

**12.** The Court also notes that Local Rule CV–56(b) states that a party's response to a summary judgment motion should "be supported by appropriate citations to proper summary judgment evidence...." Local Rule CV–56(c) further states that the Court "will not scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact...." The Court notes these rules remained the same prior to

December 1, 2000, since the Federal Rules of Evidence and the Local Rules of the Eastern District of Texas changed as of that date. As the parties should be aware, by order of this Court, the pre-December 1, 2000 versions of both sets of rules govern this case.

**13.** Mrs. Doe melds incidents to inaccurately make it seem as if tape was used on Jane Doe's mouth more than once.

does not actually state the specific sections of the United States Constitution that she believes Imbert violated (or even that she brings an action against Imbert through 42 U.S.C. § 1983). She accuses SS CISD, however, of violating Jane Doe's "right to be free of state-occasioned damage to her bodily integrity and personal securities" under the Fourteenth Amendment to the United States Constitution as well as under the Fourth Amendment. (Pls.' Second Am. Original Compl. at 4.) Additionally, she uses conscious indifference language against SS CISD in such accusations. Thus, the Court deduced that she means to charge Imbert and Wardell with the same violations.[14] Imbert responds by asserting qualified immunity bars these claims against her.

### i. The Supreme Court's and Fifth Circuit's Qualified Immunity Analytical Rubric.

Imbert has moved for summary judgment on the basis of qualified immunity as delineated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Such immunity is only effective against *federal* statutory and constitutional claims. *See Cantu v. Rocha*, 77 F.3d 795, 805 (5th Cir.1996). As to such claims, persons are shielded from liability for civil damages if, "as [a] government official[ ] performing discretionary functions ..., their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In determining whether Imbert is entitled to immunity in respect of Mrs. Doe's federal constitutional claims, this Court undertook an analysis prescribed by the United States Supreme Court and the Fifth Circuit.

*Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) and later Fifth Circuit cases lay out the required multi-part analysis. As the *Siegert* court noted, "[o]nce a defendant pleads ... qualified immunity, '[[o]]n summary judgment, [a court] may appropriately determine, not only the currently applicable law, but whether the law was clearly established at the time an action occurred....'" *Id.* at 231, 111 S.Ct. at 1793 (citation omitted). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff [was] 'clearly established' at the time [a] defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Id.* at 232, 111 S.Ct. at 1793. Accordingly, courts must first determine whether "the plaintiff has alleged the violation of a 'clearly established constitutional right' under currently applicable constitutional standards." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir.1997). "For a right to be clearly established, there does not have to be a prior case directly on point, but the unlawfulness of the precipitating acts must be apparent...." *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir.1995).

The Court's second step is to "determine whether [asserted] constitutional right[s] [were] ... clearly established at the time

---

14. Mrs. Doe lists the Ninth Amendment to the United States Constitution as a ground of attack against SS CISD, but the Court believes this to be improper since that amendment by its terms appears inapplicable. It reads: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. AMEND. IX. Also, according to one important constitutional treatise: "[T]he Ninth Amendment has not been used as the basis for defining rights of individuals...." *See* 2 RONALD D. ROTUNDA AND JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 15.7 at 628 n. 10 (3d ed.1999).

of the alleged violation[s]." *Gunaca v. State of Texas*, 65 F.3d 467, 474 (5th Cir. 1995); *See also Petta v. Rivera*, 143 F.3d 895, 899–900 (5th Cir.1998). Additionally, courts must consider whether conduct was "objectively reasonable" 'in light of . . . legal rules clearly established at [such] time' " . . . ." *Hassan*, 55 F.3d at 1079 (citation omitted). In assessing whether rights were clear at a prior time, courts must exercise the caution called for in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Specifically, "the right[s][an] official is alleged to have violated must have been 'clearly established' in a more particularized . . . sense: The contours of the right must [have been sufficiently clear that a reasonable official would [have] under[stood] that what he [was] doing violat[ed] [such] rights]." *Id.* at 640, 107 S.Ct. at 3039. Hence, Imbert could have been shielded even if Mrs. Doe alleged violations of presently and previously recognized rights, so long as "reasonable public officials could [have] differ[ed] on the lawfulness of [her] actions." *Hassan*, 55 F.3d at 1079.

The Fifth Circuit has also set forth evidentiary burdens for the parties that this Court utilized. Defendants like Imbert must first plead qualified immunity and show they are government officials "whose position[s] involve[ ] the exercise of discretion." *Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir.1997) (citing *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir.1992)). This done, "the plaintiff has the burden 'to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.' " *Id.* Because there is no serious dispute over whether Imbert is an official bearing discretionary authority,[15] the Court recites the substantive qualified immunity test as applied here and as informed by the *Pierce* burden.

### ii. Mrs. Does' Allegations as Violations of Jane Doe's Current Federal Rights.

Mrs. Doe has not alleged the violation of a clearly established constitutional right under the Fourth Amendment to the United States Constitution. In reaching this conclusion, the Court focused as it must on the more particularized sense of any such right in the context of this suit.[16] The issue then is whether a disruptive and troubled schoolchild like Jane Doe has a clearly established right under the Fourth Amendment to be free from the conduct in which Imbert and her subordinates allegedly engaged.[17]

---

15. *See* Section III.A.2. of this opinion and order.

16. This emphasis on the particularized nature of rights violations is more fully explored in the main text in the Court's discussion of Mrs. Doe's Fourteenth Amendment substantive due process claims. The Court does not place the discussion here because, as noted in the main text, it does not believe Mrs. Doe really means to push her Fourth Amendment claim forward.

17. As is apparent from the introduction to this opinion and order, the parties disagree as to many of the particular facts in this case. Thus, in considering Imbert's qualified immunity claims on summary judgment, the Court

must do so generally assuming the facts to be as urged by Mrs. Doe. *See* Karen M. Blum, *Section 1983: Qualified Immunity*, PRACTICING LAW INSTITUTE at 427 (1998). While the Court generally will assume disputed facts to be as urged by Mrs. Doe, it will not do so, however, when a reasonable juror could not see a matter Mrs. Doe's way. For instance, as noted in the main text, the parties differ on the issue of whether wrappings were administered to punish Jane Doe for not doing school work. The Court believes no reasonable juror could take the meager evidence offered by Mrs. Doe and find punishment to be SS CISD's motive. The Court's discussion in the main text makes this point clear.

■ For various reasons, the Court does not believe Jane Doe's Fourth Amendment rights are implicated here. Under the amendment, "[t]he right of the people to be *secure in their persons*, houses, papers, and effects, against *unreasonable* searches and *seizures*, shall not be violated...." U.S. CONST. AMEND. IV (emphasis added). Mrs. Doe obviously has to argue that Jane Doe's person has been unreasonably "seized." The Court just does not believe that the amendment readily captures school officials restraining a "raging" child or placing her in a timeout room. This is especially so because the Court's own brief research on the Fourth Amendment's applicability has turned up no Fourth Amendment law that suggests it should satisfy Mrs. Doe's burdens for her.[18] Moreover, Mrs. Doe has not in any way undertaken the *Pierce* showing that Imbert's conduct violated "clearly established law"—whether as of the present or as of the time the conduct occurred. Indeed, not only has she not cited a Fourth Amendment case from any court that would suggest the conduct alleged here runs afoul of the Fourth Amendment today or when a particular event happened, she has not even argued about the Fourth Amendment. As a result, the Court does not believe it is necessary to undertake any detailed Fourth Amendment analysis.

■ Mrs. Doe's claims regarding Jane Doe's liberty interests protected by the substantive due process component of the Fourteenth Amendment prove more serious but also ultimately founder. The Court finds Imbert is qualifiedly immune, because Mrs. Doe has failed to meet the first prong of the *Siegert* test—alleging violation of a clearly established constitutional right. This is so despite the Court's and the parties' recognition of a person's general rights to freedom from restraint or to bodily integrity under the substantive due process component of the Fourteenth Amendment.[19]

The problem for Mrs. Doe is that clearly established boundaries of the right to be free from restraint simply do not capture the situation at hand; the starting point to realize this is to define the rights at stake here correctly. Apart from *Anderson's* admonition in the narrow qualified immunity context that "right[s][an] official is alleged to have violated must have been 'clearly established' in a more particularized ... sense," *Anderson* notes too that while the right to due process of law is quite clearly established by the Due Process Clause, and thus "there is a sense in which any action that violates that [c]lause (no matter how clear it may be that a particular action is a violation) violates a clearly established right," "[m]uch the same could be said of any other constitutional violation...." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3039. *Anderson* cautions

---

18. *See also* Thomas K. Clancy, *What does the Fourth Amendment Protect: Property, Privacy, or Security?*, 33 WAKE FOREST L.REV. 307, 345–49 (1998) (discussing, among other things, "protected personhood interests" including the right to be left alone, individual freedom, personal dignity, bodily integrity, the inviolability of the person, the sanctity of the person, and the right of free movement and citing cases articulating these rights).

19. It is important to note that the Court must undertake this first prong of the *Siegert* test. This is made plain by *County of Sacramento v.*

*Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The Supreme Court commented: "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *Id.* at 841 n. 5, 118 S.Ct. at 1714 n. 5 (citation omitted).

that rights must be carefully assessed so that plaintiffs may not turn qualified immunity into "unqualified liability" by alleging the violation of extremely abstract rights. *Id.* Supreme Court cases outside the qualified immunity context also make it clear that the *Anderson* admonition applies to the first prong of the *Siegert* test in addition to the inquiry over whether a right's contours were established at the time of allegedly illegal conduct.

The Supreme Court has stated: "[S]ubstantive-due-process cases [require] a 'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997) (citation omitted). In fact, in *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992), the Supreme Court noted that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended," and thus that it is important "to focus on the allegations in [a] complaint to determine how [a plaintiff] describes the constitutional right at stake...." Further, the *Glucksberg* court noted in discussing *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) that while *Cruzan* is described as a "right to die" case, the Supreme Court has been precise: "We assumed that the Constitution granted competent persons a 'constitutionally protected right to refuse lifesaving hydration and nutrition.'" *Glucksberg,* 521 U.S. at 723, 117 S.Ct. at 2269.

Fifth Circuit cases too indicate that how a right is described at the outset of the *Siegert* test is crucial. For instance, in *Doe v. State of Louisiana,* 2 F.3d 1412, 1416–17 (5th Cir.1993), the court noted that although it agreed with plaintiffs that several cases have recognized a constitutional right of family integrity under the Fourteenth Amendment, it disagreed that such cases established the full contours of a parent's liberty interest in family integrity clearly. Also, in *Kiser v. Garrett,* 67 F.3d 1166, 1173 (5th Cir.1995) (emphasis added), the court stated that: "... the contours of [the substantive due process right to family integrity] are not well-defined, and continue to be nebulous, especially *in the context* of a state's taking temporary custody of a child during an investigation of possible parental abuse." The *Kiser* court further noted that: "Even assuming that such a right exists *under the circumstances involved here,* it certainly was not clearly established...." *Id.* (emphasis added). These two cases signal that the clarity of a right's contours factor into the first phase of the *Siegert* analysis.

While all parties agree that Jane Doe has a general substantive due process right to bodily integrity, the cases cited *supra* prove that not to be the required level of detail for this case. Were it so, the first phase of the *Siegert* inquiry here would be easy. Under the facts alleged by Mrs. Doe, or for that matter by the Defendants, Imbert and others at Imbert's direction breached Jane Doe's bodily integrity. A right to bodily integrity, however, sounds a good bit like the right to family integrity even though by its nature, a right to integrity of one's own body is more readily analyzed than the right to family integrity. Asserted at Mrs. Doe's level many actions one would never think unconstitutional would violate the "clearly established" right to bodily integrity.

As the cases demonstrate, it is particular allegations, context, and circumstance that determine rights at stake. Hence, the Court believes the question presented is whether Jane Doe's substantive due process rights provide her, an emotionally

disturbed child known to be so to school officials shortly before a series of outbursts, the right to be free from restraints used to control her outbursts so as to prevent harm to herself and those charged with the responsibility of educating her.[20] The Court first answers this question no in light of cases put forward by Jane Doe in support of her claim.

Mrs. Doe argues strenuously that *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir.1994) makes her case for having alleged a violation of a currently established constitutional right. Her briefing is little more, however, than an uncritical string of quotations from the case. The Court's careful examination of *Taylor* reveals that it does not aid Mrs. Doe's case in the way she argues.

The Fifth Circuit's statement and restatement of its holdings and the questions presented in the case are instructive. The Court's initial statement of its holdings, in relevant part, reads: "We hold, first, that schoolchildren do have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment *and that physical sexual abuse* by a school employee violates that right." *Id.* at 445 (emphasis added). Next, the court stated that it had to "determine whether the Constitution, through the Fourteenth Amendment substantive due process component, protects school-age children attending public schools *from sexual abuse inflicted by a school employee.*" *Id.* at 450 (emphasis added). Further, the Fifth Circuit noted that: "Jane Doe's substantive due process claim is grounded upon the premise that schoolchildren have a liberty interest in their bodily integrity ... *and upon the premise that physical sexual abuse* by a school employee *violates that right.*" *Id.* (emphasis added). Finally, the court held that "Jane Doe clearly was deprived of a [recognized] liberty interest," seemingly because, "there is never any justification for sexually molesting a schoolchild...." *Id.* at 451.

*Taylor* simply was about sexual abuse of a child and cannot establish that Jane Doe's general liberty interest in bodily integrity makes for a constitutional violation here. Not only do recitations from the *Taylor* case make this point, but the case's facts do so as well. In *Taylor*, a school teacher used his position to coerce a high school freshman into having sexual relations with him over a period of more than a year. *Id.* at 446–449. Moreover, the teacher had previously engaged in inappropriate conduct with other students and rumors of his behavior had reached school officials as early as a year before his approaching the student suing in the case. *Id.* at 446. School officials had inklings about or were aware of the teacher's conduct toward the Jane Doe in the case throughout the period he interacted with her. *Id.* at 447–50. It is apparent that the facts in *Taylor* represent an egregious case supporting Judge Patrick E. Higginbotham's concurring sentiments:

> The majority and Judge Garwood's dissent agree today that the Due Process Clause of the Fourteenth Amendment affords Doe a liberty interest in her bodily integrity, protected from *certain*

---

**20.** The Court believes this approach properly analyzes the rights at stake and takes into account Judge Patrick E. Higginbotham's view: "Justice Scalia pointed out in *Anderson v. Creighton*, ... the hazards of framing the legal question at too great a level of generality. The error can be made in the opposite direction—a search so narrowed that legal nuance rises to uncertainty and ultimately confounds common sense." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 465 (5th Cir. 1994) (J. Higginbotham, concurring). As the main text hopefully makes clear, this Court's rights analysis does not seek to confound common sense but to embrace it.

*unwarranted state deprivations* [citation omitted]. . . . This protection *extends* to a student's right to be free from corporal punishment in school *if arbitrary, capricious or wholly unrelated to a legitimate state purpose* [citation omitted]. This right *also protects a fifteen-year-old* student *from a teacher who uses his authority to sordid sexual ends.*

*Id.* at 459 (emphasis added).[21] The cases cited by *Taylor* for its finding of a rights violation too show the case *sub judice* not to come within *Taylor's* rubric.

The *Taylor* court particularly cites *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981). The court cited *Shillingford* to show that: " . . . as early as 1981 . . . [the Fifth Circuit had found] '[[t]]he right to be free of state-occasioned damage to a person's bodily integrity . . . [[to be]] protected by the [[F]]ourteenth [[A]]mendment guarantee of due process.' " *Taylor Indep. Sch. Dist.*, 15 F.3d at 450–51. *Shillingford* involved, however, a tourist photographing a police arrest and as a result being clubbed by an officer. *Id.* at 451. Moreover, the *Shillingford* court held:

> [W]e must inquire into the amount of force used in relationship to the need presented, the extent of the injury inflicted and the *motives of the state officer.* If the state officer's action caused severe injuries, was *grossly disproportionate to the need for action* under the circumstances and was *inspired by malice* . . . so that it . . . *shocks the con-*

*science,* it should be redressed under Section 1983.

*Shillingford,* 634 F.2d at 265 (emphasis added) (citations omitted).[22] As is clear, *Shillingford* required an examination of motive, proportionality of action, and malice, indicating that not every act of "state-occasioned" damage makes for a constitutional tort.

Another case which the *Taylor* court relies upon, as does Mrs. Doe, argues against and not for Mrs. Doe.[23] In *Jefferson v. Ysleta Independent School District,* 817 F.2d 303, 304 (5th Cir.1987), the Fifth Circuit took up a case where a teacher tied an eight-year-old student to a chair using "jump rope . . . securing her by the waist and legs." "During the first day [she] was tied to the chair for the entire school day, except for the lunch hour. On the second day, [she] was tied to the chair for protracted periods. While tied, [she] was denied access to the bathroom." *Id.* The incident, which no other student experienced, "was part of an *instructional technique imposed by school policy.*" *Id.* (emphasis added). On this set of facts, the Fifth Circuit held that the student's right to be free from bodily restraint was implicated. *Id.* at 305 (citing *Shillingford,* 634 F.2d at 265 (citing *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980))). Significantly, however, the court noted that *Shillingford* dealt with the right to be free from state-occasioned damage to a person's bodily integrity, and that "[t]he same applies to state-occasioned restraints which are

---

**21.** Judge Edith Jones' dissenting opinion also hints that the right discovered in *Taylor* is not nearly as broad as Mrs. Doe would have the Court believe: "[T]he majority . . . [finds] a hitherto unrecognized and still-vague *constitutional right against sexual molestation of underage minors.*" *Id.* at 475–76 (J. Jones, dissenting) (emphasis added).

**22.** *Shillingford* is no longer entirely good law even with respect to the situation with which

it directly dealt. *See Petta,* 143 F.3d at 902. The Court discusses *Taylor's* citation to *Shillingford,* however, to show that the rationale behind *Taylor* does not support Mrs. Doe.

**23.** Mrs. Doe's briefing also cites a number of cases unhelpful to this first prong of the *Siegert* test, because a constitutional violation was presumed or established in them. *See, e.g., Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745 (5th Cir.1993).

*not justified by the victim's conduct or other extenuating circumstances." Jefferson,* 817 F.2d at 305 (emphasis added). The court emphasized this situational aspect of its ruling when it wrote that there was "no suggested justification, such as punishment or discipline." *Id.*

■ *Jefferson* actually suggests that the restraints used here have constitutional grounding. Certainly, the child's conduct here was more inviting of some type of restraint than the behavior of the child in *Jefferson.* Moreover, nothing in Jefferson indicates the child in that case posed the types of problems to her teacher or school that Jane Doe posed to SS CISD. *Taylor, Shillingford,* and *Jefferson* then, stand for the proposition that a substantive due process violation of a person's bodily integrity requires arbitrariness or a lack of reasonable justification.

Such factors are just not present here. To begin, there is little indication that SS CISD officials were aware of Jane Doe's troubled home life. That she had such trouble has also not been disputed. Moreover, even under Mrs. Doe's version of the facts, Imbert didn't receive her first warning that Jane Doe might be Bi-polar until the middle of October 1998. It is important to note that the first major incident of restraint occurred only a few weeks later. Mrs. Doe herself alleges that the Defendants learned about Jane Doe's PTS condition on December 3, 1998. That is just a short while after Jane Doe returned from a hospital stay and two days after the incident in counselor Tim Kemp's office. Also important to note is that Mrs. Doe has been unable to contradict SS CISD's vast evidence that Jane Doe did, to use the

district's terminology, "rage" before district personnel utilized restraint of any kind. All of this is to say that, even taking the inferences most favorably to Mrs. Doe, the severity of Jane Doe's condition clearly imposed itself on SS CISD in a trying manner. That officials reacted the way they did should not have been entirely unexpected.

The record also shows unequivocally that Imbert and SS CISD personnel sought, even if with hindsight, they made errors, to protect Jane Doe's welfare. As a general matter, SS CISD maintains, and has at all relevant times maintained policies and procedures designed to meet the needs of special education students and comply with all state and federal requirements applicable to them. (Defs.' Mot. Summ. J. Supporting Br., Ex. S).[24] Moreover, shortly after Jane Doe's initial incident of raging, an ARD meeting was held where Mrs. Doe, mental health professionals, and school personnel including Wardell and Imbert sought to determine methods to handle Jane Doe's rage all the while seeking to continue her education. Imbert has also testified that she told Mrs. Doe on more than one occasion that Jane Doe was raging such that she had to be wrapped. Mrs. Doe offers nothing to suggest that she instructed Imbert not to wrap Jane Doe on those occasions even though, for purposes of summary judgment, the Court accepts Mrs. Doe's testimony that she did not affirmatively approve wrapping at any time and that she never conceived tape or a cot might be used. Mrs. Doe also has not contradicted the district's evidence that Jane Doe was a danger to herself on

---

24. The Court initially struck this exhibit as not having been properly authenticated. The Court permitted the Defendants to resubmit it in proper form. The Court agrees that Defendants have now met the authentication requirements of the Federal Rules of Evidence with respect to the exhibit and consequently considers it in evaluating Defendants' summary judgment motion.

occasions Imbert reported to Mrs. Doe that Jane Doe had to be wrapped.

Mrs. Doe simply has not created a genuine dispute as to SS CISD's and its employees' motives for wrapping Jane Doe. As only one example, CPS' Wayne Hale testified that he thought SS CISD's actions were taken to deal with "out-of-control" behavior, not as punishment. The Court notes this, because Mrs. Doe cites Hale as a source for Jane Doe's reported statement(s) that she "didn't want to do [her] work and ... got taped...." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J., Ex. D at 58.) Reading Mrs. Doe's citation in context, however, refutes the inference she advances.

As another example, Mrs. Doe cites to Imbert's supposed statement before the incident in Kemp's office that: "[Imbert] ... was just about to get angry with [Jane Doe] so [Imbert] got her and [they] went to Mr. Kemp's office." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J. at 3.) Based on Imbert's testimony, Mrs. Doe says that this occurred after Jane Doe became defiant, refusing, for instance, to sit down when Imbert instructed her to sit and reaching for candy in Imbert's office. Mrs. Doe proceeds to state that once in Kemp's office Imbert placed gauze over Jane Doe's mouth. Mrs. Doe's presentation suggests Imbert's actions were meant as punishment. An examination of Imbert's testimony, however, reveals no one acted aggressively toward Jane Doe or sought to restrain or isolate her until after she began to rage. Thus, yet again, context reveals Mrs. Doe's inferences to be unreasonable and improper. Mrs. Doe's other attempts to create a fact issue on this point similarly fail upon inspection.[25] The facts then, taken according to Mrs. Doe's view where she has contradicted Defendants' competent proof with her own competent evidence, simply lead far afield of the sexual molestation, police clubbing, and arbitrary rope-tying found in *Taylor, Shillingford,* and *Jefferson.*

Ironically, the Defendants do a much better job of presenting a case with facts that might have supported Mrs. Doe's view that she has alleged violation of a clearly established constitutional right. They raise *Heidemann v. Rother,* 84 F.3d 1021 (8th Cir.1996). There, a "nonverbal, mentally and physically disabled girl who was nine years old" when the case was filed but who "functioned at approximately a one-year-old level" was also subjected to restraints. *Id.* at 1025. In fact, the girl's teachers blanket-wrapped her by binding her body so that she could not use her arms, legs, or hands. *Id.* They did so on the advice of a licensed therapist providing physical therapy and related services to special education children in the defendant school district. *Id.* The therapist recommended the wrapping to provide the child security, comfort, warmth, stability, and a "calming effect." *Id.*

The mother of the child, as her next friend, brought suit under § 1983 alleging violations of the daughter's constitutional rights to substantive and procedural due process, among other claims. *Id.* at 1026. The mother claimed the child was wrapped

---

**25.** Mrs. Doe's case really just assumes that she has created a genuine dispute as to the punishment issue. Indeed, in one section of her brief she says that Defendants have not complied with the rules set forth in a document she has submitted entitled, "Explanation of Rights and Procedural Safeguards of a Parent With a Child With Disabilities in School," apparently written by the Texas Education Agency in 1997. The document states that a school may not punish a child for conduct which is a manifestation of a disability. Like the rest of her evidence, however, nothing in the document sufficiently suggests that SS CISD was punishing Jane Doe.

against her will for periods of one-half hour or more. *Id.* The mother further claimed that the wrapping was used in lieu of proper educational and habilitative programming for convenience sake; she did not approve of the technique. *Id.* at 1026. Finally, the mother alleged that she once found her daughter "blanket wrapped on the floor, with flies crawling in and around her mouth and nose ... [and that] the blanket was so tightly wrapped ... that she needed assistance to remove it." *Id.* She blamed the school district, various district personnel, the school board, and the therapist, and the Eighth Circuit's review of the district court's decision first confronted the issue now faced by this Court. *Id.* at 1025.

The Eighth Circuit's decision against a constitutional violation argues · against a finding of one here. Obviously, the facts in *Heidemann* appear facially similar to those here. That the Eighth Circuit did not find a constitutional violation to be alleged in such circumstances is at least superficially telling here. More substantively important is the standard the Eighth Circuit adopted to reach its decision. If it is the requisite standard here, the Court believes Imbert would prevail on the first leg of the *Siegert* test. Specifically, the Eighth Circuit adopted the legal standard in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

*Youngberg* dealt with restraints used upon a "profoundly retarded" young man involuntarily committed to a state-operated hospital. *Id.* at 309–10, 102 S.Ct. at 2454–55. The United States Supreme Court had determined that the plaintiff had a constitutionally protected interest in freedom from bodily restraint. The Supreme Court cautioned, however, that in "determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance

the 'liberty of the individual' and 'the demands of an organized society.'" *Id.* at 320, 102 S.Ct. at 2460 (citation omitted).

The *Youngberg* standard also employed in *Heidemann* was to assess "whether the defendants' conduct was 'such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of the plaintiff as to demonstrate that the defendants did not base their conduct on professional judgment.'" *See id.* at 314, 321, 102 S.Ct. at 2457, 2461 (citations omitted). The Eight Circuit concluded that because the defendants relied on a licensed therapist's advice in wrapping the child, they did not violate her general right to be free from unreasonable bodily restraint. *Heidemann*, 84 F.3d at 1029.

Mrs. Doe argues that the same result does not attain here because only a blanket was used in *Heidemann* and Jane Doe's therapist, Dr. Samson, did not recommend the manner of restraint employed here. These distinctions do not matter even as the Court accepts their truth. As a starting point, the Court does not believe that a child wrapped "only in a blanket" being left on the floor with flies swirling around her mouth is less disturbing than what occurred here. Further, as noted in the introduction to this opinion and order, Dr. Samson did testify that he told Imbert wrapping Jane Doe was "better than allowing the child to bang herself off the walls." Moreover, even though Samson did not realize that tape, safety pins, or a cot may have been used on one or more occasions, Samson testified that someone not having wrapping expertise "would not necessarily know[ ]" "the rules and regulations that go with restraint." Thus, from the perspective of Imbert and the other SS CISD personnel, they relied on professional judgment.[26] Samson apparently just did

---

**26.** As noted in the main text, Imbert apparently heard about the wrapping technique

not warn Imbert about matters he concedes someone like her would likely be unaware. As a result, the Court does not believe Mrs. Doe has alleged a constitutional violation here under the *Heidemann/Youngberg* standard.[27]

In addition to comparing specific cases, the Court finally concludes that Mrs. Doe has not asserted a violation of a clearly established constitutional right based on the parameters set forth in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). There, the Court considered a mother's and father's suit against Sacramento County and an individual police officer in the context of a high-speed police chase. *Id.* at 836–37, 118 S.Ct. at 1712. As a result of the chase, a teenager was killed and his parents urged a Fourteenth Amendment substantive due process deprivation of life claim. *Id.* at 837–38, 118 S.Ct. at 1712. While the Supreme Court's main holding pertained to the narrow situation at hand, the case generally deals with substantive due process analysis.

■■■ Underpinning the fairly lengthy series of considerations for sub-stantive due process analysis presented in *County of Sacramento* was the Supreme Court's proclamation that " '[[t]]he touchstone of due process is protection of the individual against *arbitrary* action of government.' " *Id.* at 845, 118 S.Ct. at 1716 (citations omitted) (emphasis added). Criteria to identify what actions are fatally arbitrary under due process analysis differ depending on whether pieces of legislation or, as in this case, specific acts of governmental officers are at issue. *Id.* at 846, 118 S.Ct. at 1716. In "executive action" cases such as this, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *Id.* (citation omitted). "To this end, for half a century now [the Supreme Court has] spoken of executive abuse of power which shocks the conscience." *Id.* at 846, 118 S.Ct. at 1717. In fact, in executive action cases, whether behavior is conscience-shocking is "an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed." *Id.* at 847 n. 8, 118 S.Ct. at 1717 n. 8. Only then "might there be a debate about the sufficiency of histori-

from a fellow educator. She called Dr. Samson for his opinion after Jane Doe had already been wrapped. The Court does not believe these two facts diminish Imbert's claim to have been relying on professional advice. Nor does the Court believe that the one wrapping incident that occurred after CPS officials told Imbert or Wardell they should not wrap Doe takes Imbert out of the *Heidemann* umbrella. Indeed, in *Heidemann,* the plaintiffs submitted affidavits of professionals in the field who would not have recommended the use of blanket wrapping under the circumstances present there. *Heidemann,* 84 F.3d at 1030.

**27.** Even though *Heidemann* superficially seems close to the events here, it is important to note that the Court is not certain the Fifth Circuit or the Supreme Court would adopt the *Heidemann/Youngberg* standard here. In creating the standard, the Supreme Court explicitly stated:

> We think the standard articulated [by the Chief Judge of the Third Circuit (the court hearing the case below) ] affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and *the rights of the involuntarily committed* to . . . freedom from unreasonable restraints.

*Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 (emphasis added).

The Court repeats that the *Youngberg* plaintiff was a "profoundly retarded" young man committed to a state-operated institution. The *Heidemann* plaintiff was similarly disabled though in school. Conversely, Jane Doe, while emotionally troubled, can speak, listen, reason, etc. The Eighth Circuit's use *of Youngberg* in *Heidemann* simply may make more sense than to use it here.

cal examples of enforcement of the right claimed, or its recognition in other ways." *Id.*[28]

■ Whether behavior is conscience-shocking depends on the state's or state actor's alleged degree of fault. "[C]onduct intended to injure in some way unjustifiable by any government interest is ... most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. at 1718 (citation omitted). "Whether the point of the conscience[-]shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence,'" [citation omitted] is a matter for closer calls. *Id.* Deliberate indifference is a middling fault standard. *Id.* at 850, 118 S.Ct. at 1718. The Supreme Court has agreed that conduct resulting from such indifference may shock the conscience.[29] "Deliberate indifference that shocks in one environment [, however,] may not be so patently egregious in another, and ... concern [for] preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience[-]shocking." *Id.* at 850, 118 S.Ct. at 1718–19.

For all of the reasons already noted and additional factors, the Court does not find Imbert's actions to be conscience-shocking such that Mrs. Doe's allegations, if proved, should be adjudged to amount to constitutional torts. The fluid and rapid circumstances Imbert and SS CISD found themselves in simply do not lend themselves to finding conscience-shocking. Indeed, the Supreme Court suggests this in *County of Sacramento:*

> [A]ttention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other.... As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical [citation omitted] and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible.... [D]eliberate indifference does not suffice for constitutional liability (albeit under the Eighth Amendment) even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance.

*Id.* at 851, 118 S.Ct. at 1719. The Supreme Court made it clear that a deliberate indifference standard may not adequately capture the " 'importance of ... competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 852, 118 S.Ct. at 1720. (citing *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)).

■ Deliberate indifference is what Mrs. Doe must allege. She occasionally uses the words "intentionally" or "willfully" in describing her constitutional allegations against the Defendants, but the recurring themes in her complaint and

---

**28.** Nonetheless, the Court considered historical examples first because that is how the parties approached their summary judgment briefing.

**29.** *County of Sacramento* cites, as an example, deliberate indifference to the medical needs of someone jailed while awaiting trial. *Id.* at 850, 118 S.Ct. at 1718 (citing *Barrie v. Grand County, Utah,* 119 F.3d 862, 867 (10th Cir. 1997) and *Weyant v. Okst,* 101 F.3d 845, 856 (2nd Cir.1996)).

summary judgment briefing are "deliberate indifference," "conscious disregard," and "recklessness." As the Supreme Court indicates, in the realm of constitutional injury intentionality arises with "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 1718. No one can plausibly suggest the Defendants intended to injure Jane Doe without justification or, indeed, to injure her at all. Here, the record is that over a relatively short period, school officials faced a volatile situation about which they deliberated with Mrs. Doe, mental health professionals, and others. The record shows that they sought methods other than to wrap Jane Doe to ensure her safety and that of those around her.

At most, Mrs. Doe's allegations suggest SS CISD should have had better procedures anticipating problems posed by children like Jane Doe. In this regard, Mrs. Doe notes, and appears to be correct, that the wrappings occurred without the benefit of any preset standards. Also, it is not clear that the district's special education program functioned as it should have in Jane Doe's case. That SS CISD did not maintain guidelines to legally and appropriately care for and manage special educations students, however, is, as noted *supra*, simply not true. Each child is different, circumstances vary, and the Court wonders how SS CISD can really be expected to have foreseen the events as they occurred. This is especially so given the lack of any evidence providing the district with specific instruction as to handling Jane Doe's outbursts. Certainly, a policeman engaging in a high-speed chase through residential areas is more deliber- ately indifferent to his suspect's life interest than any of the actors here were to Jane Doe's liberty interests.

SS CISD's possible unpreparedness in this case would also not be surprising given the high cost and difficulty of providing special education. In fact, for twenty-six years the United States Congress has required schools receiving federal funds to provide a variety of special services to disabled students. While Congress promised to pay forty percent of the bills for such services, however, it now only pays about fifteen percent. Charles Ornstein, *Schools Push for More Funding to Cover Rising Special–Ed Costs*, DALLAS MORNING NEWS, May 11, 2001.[30] One congressman has labeled this situation the "mother of all mandates." *Id.* None of this is to say that unpreparedness, if unlawful, may be excused by a lack of funding. Rather, Mrs. Doe's allegations are better dealt with other than as constitutional torts. In so ruling, the Court is mindful of Judge Edith Jones' view in *Taylor* that, as of the time she wrote,[31] "[a]part from developing the amorphous 'right of privacy' ..., the [Supreme] [C]ourt has authored no decision expanding substantive due process rights for many years." 15 F.3d at 478 (J. Jones, dissenting). Despite the emotions present here, this Court will leave it to the Supreme Court or the Fifth Circuit to expand such rights.

### 2. Mrs. Doe's Claims Under the TEX. EDUC.CODE. and Tort Claims.

In addition to pressing federal constitutional claims regarding Imbert's use and direction of restraints, Mrs. Doe incorrectly argues that under TEX. EDUC.CODE

---

**30.** According to the United States Department of Education, nearly 478,000 Texas children were in special education programs in 1997–98, up fifty three percent from a decade earlier. *Id.*

**31.** March 3, 1994 is given as the date of decision for the *Taylor* case.

§ 21.912, Imbert is liable to Jane Doe for using excessive force while disciplining Jane Doe. Under TEX. EDUC.CODE § 22.051, the successor to § 21.912:

(a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students....

(c) In this section, "professional employee" includes:

(1) a superintendent, principal, teacher,....[32]

TEX. EDUC.CODE ANN. § 22.051 (Vernon 1996). By its terms, the section does not affirmatively create rights for a plaintiff, but, rather provides immunity from personal liability.

 Imbert argues that she has met all the elements of § 22.051 and is entitled to its protections; Mrs. Doe predictably disagrees. Under the statute and interpretations of it in *Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978) and *Hopkins v. Spring Independent School District,* 736 S.W.2d 617, 618 (Tex.1987), the elements that a defendant must establish are:

1. The defendant was a professional employee of a school district;

2. The defendant's challenged conduct was within or incident to the scope of his duties;

3. The defendant's duties involved the exercise of discretion or judgment; and

4. The defendant's acts did not cause the plaintiff injury as a result of the use of excessive force in disciplining the plaintiff or negligence in disciplining the plaintiff.

No extended discussion is required to see that Imbert has satisfied elements one and two. Indeed, Mrs. Doe does not challenge her on these elements. Instead, she argues that Imbert's conduct exhibited excessive force in disciplining Jane Doe and that Mrs. Doe did not have discretion not to report child abuse.

 Mrs. Doe's argument with respect to the character of Imbert's actions as excessive force during discipline is the easiest with which to dispense. *Hopkins* tells this Court that " '[d]iscipline' in the school context describes some form of punishment," and that " 'negligent discipline' " is " 'punishment [[which]] involves no force, but rather requires some action on the part of the student as a result of which the student suffers bodily injury,' as in ordering a student to run laps." 736 S.W.2d at 619 (citations omitted). As the Court has noted, there is no real fact issue about punishment here.

 Mrs. Doe's arguments on the discretionary character of Imbert's duties are more difficult to deal with not because Mrs. Doe has made a cogent legal argument but because of the illogicality of her argument. To understand this, it bears repeating Mrs. Doe's allegations that Imbert: used excessive force in disciplining Jane Doe in violation of § 22.051, violated Jane Doe's federal constitutional rights, intentionally inflicted emotional distress on Jane Doe, negligently inflicted pain on Jane Doe, failed in her common law *in loco parentis* tort duty, and failed to report

---

**32.** The remainder of subsection (c) is not applicable here. Subsection (b), also not applicable here, states that: "This section does not apply to the operation, use, or maintenance of any motor vehicle."

child abuse. Section 22.051's function dispenses with Mrs. Doe's attempts to turn § 22.051 into an affirmative claim. § 22.051 does not shield one from federal constitutional claims. *See Moore v. Port Arthur Indep. Sch. Dist.,* 751 F.Supp. 671, 672 (E.D.Tex.1990). The Court has, of course, otherwise, dealt with Mrs. Doe's federal constitutional claims. Thus, Mrs. Doe can only use her argument with respect to Imbert's lack of discretion over reporting abuse against Imbert on Mrs. Doe's intentional infliction of emotional distress claim, her negligent infliction of pain claim, her *in loco parentis* claim, and her failure to report abuse claim.

■ Despite Mrs. Doe's efforts, Imbert has established all the elements of § 22.051 immunity as a matter of law as to these other claims. Significantly, Mrs. Doe does not allege that Imbert had no discretion to take actions to manage Jane Doe's school behavior. Mrs. Doe's intentional tort claim, her negligent infliction of pain claim, and her *in loco parentis* claim are based on Imbert's actions or decisions resulting in failures to take actions in managing Jane Doe. Accordingly, at a basic level, Mrs. Doe has not argued that Imbert's conduct underlying these claims was not discretionary. Indeed, under *Downing v. Brown,* 935 S.W.2d 112, 114 (Tex. 1996) (citation omitted), for purposes of § 22.051, "[m]inisterial acts are those '[[w]]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" Common sense tells the Court that, as a principal, Imbert had discretion in managing student-created disturbances. While the record suggests that her authority may be more circumscribed in the case of a

special education student, it does not indicate any source revealing her actions in dealing with the situations presented by Jane Doe to be ministerial ones.

"Where the elements of the immunity defense are established, the statute provides the employee 'is not personally liable,'" and the immunity "applies without regard to the plaintiff's theory of liability." *Williams v. Chatman,* 17 S.W.3d 694, 701 (Tex.App.—Amarillo 1999, pet. denied) (citation omitted). As *Williams* suggests, this immunity covers most forms of personal liability. *See, e.g., Davis v. Houston Indep. Sch. Dist.,* 654 S.W.2d 818, 822 (Tex.Civ.App.—Houston [14th Dist.] 1983, no writ) (upholding on immunity grounds a grant of summary judgment to individual school employees for, as agents of the Houston Independent School District, breaching a contract and wrongfully interfering with contractual relations); *Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 179 (Tex.Civ.App.—Houston [14th Dist.] 1991, no writ) (affirming summary judgment against an intentional infliction of emotional distress claim based on § 22.051's predecessor statute, § 21.912); *Jones v. Houston Indep. Sch. Dist.,* 979 F.2d 1004, 1007 (5th Cir.1992) (affirming summary judgment on plaintiff's libel claim against school employees based on § 21.912); *Chesshir v. Sharp,* 19 S.W.3d 502, 507 (Tex.App.—Amarillo 2000, no pet.) (agreeing with lower court grant of summary judgment to a teacher against parents of a child bringing a negligence action against the teacher).[33] Hence, Imbert is obviously immune with respect to Mrs. Doe's emotional distress, negligent infliction of pain, and *in loco parentis* tort claims.

**33.** Also, *Williams* itself expressly notes § 22.051 bars an *in loco parentis* claim. 17 S.W.2d at 701.

### 3. Imbert's Alleged Failure to Report Child Abuse.

Mrs. Doe's lack of discretion argument with respect to her failure to report child abuse claim must also ultimately fail. The Court notes, however, that if Mrs. Doe has a civil claim grounded on Texas' child abuse reporting statute and Mrs. Doe has sufficiently supported the charge that Imbert did not meet this duty, Imbert could not claim § 22.051 immunity as the Texas statute makes reporting mandatory. *See* TEX. FAM.CODE § 261.101(a) (Vernon Supp. 2000). Because Mrs. Doe cannot maintain a civil action against Imbert for failure to report child abuse under the pertinent Texas statute, the Court need not consider the matter in great depth.

 While it is true that under certain circumstances, an educator's duty to report abuse of a student is not discretionary, *See* Pl.'s Resp. Br. Supporting Documents Dfs.' Mot. Summ. J. at 18 (citing *Doe v. Rains Indep. Sch. Dist.*, 865 F.Supp. 375 (E.D.Tex.1994), *rev'd on other grounds* ), the Court finds no authority to suggest any civil actions arise from such a duty. The statute Mrs. Doe must rely on, TEX. FAM.CODE § 261.101(a), does not on its face create a statutory civil cause of action. Rather, TEX. FAM.CODE § 261.109(a) states that: "A person commits an offense if the person has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse ... and knowingly fails to report as provided in this chapter." TEX. FAM.CODE § 261.109 (Vernon 1996). Section 261.109(b) notes that an offense under sub-

section (a) is a "Class B misdemeanor." *Id.* Thus, on its face, Chapter 261, "Investigation of Report of Child Abuse or Neglect," creates no civil causes of action for Mrs. Doe.

Although Judge William Wayne Justice's decision in *Rains Independent School District*, 865 F.Supp. at 382, found that the predecessor to the current child abuse reporting statute "creat[ed] a standard of care [for purposes of a negligence claim] under Texas law," [34] a newer Texas Supreme Court opinion finds no such cause of action yet exists. *Perry v. S.N.*, 973 S.W.2d 301 (Tex.1998) indicates that Mrs. Doe has no civil claim grounded on the Texas child abuse reporting statute. In ruling on the negligence *per se* and gross negligence claims of parents of two minor children asserting persons visiting a day care center failed to report abuse they witnessed, the Texas Supreme Court held that: "[The plaintiffs] ... may not maintain a claim for negligence *per se* or gross negligence based on defendants' violation of the child abuse reporting statute." *Id.* at 309. The Texas court did not consider whether the plaintiffs could maintain a common law negligence action, because the plaintiffs did not raise that issue on appeal. *Id.* Specifically, the Texas Supreme Court wrote that it did "not decide whether there *should* be a common law duty to report child abuse in *some* circumstances." *Id.* at 302 (emphasis added).

The Court need not determine whether the Texas Supreme Court would allow a common law negligence claim in the cir-

---

**34.** In *Rains*, the plaintiffs brought a § 1983 claim against a teacher, among others, who knew about sexual abuse of their daughter by another teacher but failed to report it. 865 F.Supp. at 377. They also asserted a state-law negligence claim against the non-abusing teacher premised on the teacher's failure to report the sexual abuse under Texas law. *Id.* at 381. The Fifth Circuit reversed as to the § 1983 claim but merely dismissed without prejudice all the plaintiffs' state claims, which were before Judge Justice through the district court's supplemental jurisdiction. *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1417 (5th Cir.1995).

cumstances of this case. Assuming such a cause exists, § 22.051 would provide Imbert immunity against it. This is because without the mandatory requirement of reporting under the child abuse reporting statute, Mrs. Doe would simply be alleging that in the circumstances of this case, Imbert acted unreasonably in the face of a duty and thereby caused Jane Doe harm. Actually, in finding no negligence *per se* action based on the child abuse reporting statute, the Texas Supreme Court placed great emphasis on the fact that "the defendant in most negligence *per se* cases already owes the plaintiff a pre-existing common law duty to act as a reasonable person, so [a] statute's role is merely to define more precisely what conduct breaches that duty." *Perry*, 973 S.W.2d at 306. If a common law duty existed here, Imbert would be no less immunized for deciding not to report the alleged abuse than the teacher in *Chessir*.[35]

**B. Mrs. Doe's Claims Against Dr. Joe Wardell.**

**1. Mrs. Doe's § 1983 Claims.**

Mrs. Doe levels the same constitutional charges at Wardell through § 1983 that she does at Imbert; she fails for the same reasons. Wardell, like Imbert, has asserted qualified immunity. A detailed analysis in Wardell's case is not necessary, however, because the Court found Imbert qualifiedly immune at the first stage of the *Siegert* analysis. That is to say, the Court did not find Imbert immune because Jane Doe's constitutional rights were not clearly established when the events at issue took place or because Imbert acted reasonably. Instead, the Court has determined that under the totality of the circumstances of this case, Mrs. Doe has not alleged a violation of a clearly established constitutional right. The Court's analysis included War-

---

**35.** Legal cleverness aside, the Court believes it inappropriate for Mrs. Doe to accuse Imbert of failing to report abuse if that is what she intended. The statute requiring such reporting is obviously designed to force bystanders witnessing or knowing about one abusing a child to report such abuse. Here, it is silly to suggest Imbert was a bystander. She directly oversaw the SS CISD's response to Jane Doe. In fact, Mrs. Doe strenuously calls attention to Imbert actually having engaged in the actions Mrs. Doe labels abusive. Moreover, the Texas Family Code requires a person *"having cause to believe* that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person [to] immediately make a report...." Tex. Fam.Code § 261.101(a) (Vernon Supp. 2000) (emphasis added).

As has been indicated in discussing the issue of punishment as a motive here, the record is not really open to debate or interpretation on whether Imbert thought SS CISD was abusing Jane Doe. To be sure, on January 20, 1999, Christy Douglas of CPS reports that one of her colleagues apparently talked to Imbert after the wrapping on that day and advised Imbert that the school's actions toward Jane Doe were of the type that would result in CPS

"getting a referral ... for physical abuse." (Pls. Resp. Br. Supporting Documents Defs.' Mot. Summ. J., Ex. E at 40.) Christy Hale's testimony reveals, however, that Imbert argued with Hale's CPS colleague over what she was supposed to do given Jane Doe's behavior. Imbert apparently also told CPS that Dr. Samson had recommended wrapping. This is not to redo the *Heidemann/Youngberg* analysis, but, rather to note that any abuse had been reported by January 20, 1999, and to say that the record shows Imbert not only did not have cause to believe she had committed abuse but did not agree that her conduct or that of SS CISD personnel was abusive.

If, at the end of the day, Mrs. Doe were allowed to bring a failure to report abuse claim in this case, § 22.051 would effectively be eviscerated in many situations where it is appropriately utilized. All plaintiffs would have to do is accuse school personnel involved in discipline or behavior management of abuse and their cases would survive. In just about every way then, Mrs. Doe's attempt to use Texas' statutory duty to report abuse as a means of defeating Imbert's § 22.051 immunity is poorly conceived.

dell's knowledge and oversight of lower level district personnel in analyzing Imbert's immunity defense. Thus, if it is correct that Mrs. Doe has not alleged a violation of a constitutional right in the case of Imbert, it makes sense for Wardell to be cloaked with immunity as well.[36]

### 2. Mrs. Doe's Other Claims Against Dr. Wardell.

Mrs. Doe charges Wardell with all but one of the same state-law infractions she attributes to Imbert [37] and she does not succeed with Wardell either. There is no reason in the law, record, logic or common sense to suggest Wardell's decisions to act or not to act in this case were any less a part of his duties or any less discretionary than those of Imbert. Consequently, he too enjoys § 22.051 immunity. Accordingly, the Court turns its attention to Mrs. Doe's claims against SS CISD.

### C. Mrs. Doe's Claims Against SS CISD.

#### 1. SS CISD's § 1983 Liability.

▇▇ Because of the manner in which this Court has resolved Mrs. Doe's constitutional claims against Imbert and Wardell, she is foreclosed from asserting such claims against SS CISD even though SS CISD may not assert a qualified immunity defense. *Collins v. City of Harker Heights, Texas* is appropriately instructive in this regard. There, the United States Supreme Court stated that:

> [P]roper analysis requires ... [considering] ... two different issues when a § 1983 claim is asserted against a [school district]: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [school district] is responsible for that violation.

503 U.S. at 120, 112 S.Ct. at 1066 (citations omitted). By virtue of deciding Imbert's and Wardell's qualified immunity at the first stage of the *Siegert* test, the Court has already decided the first issue against Mrs. Doe. In fact, in *Collins,* the plaintiff had sued the City of Harker Heights, Texas for the death of her husband due to asphyxia after entering a manhole on the grounds that his Fourteenth Amendment rights "to be free from unreasonable risks of harm ... and to be protected from the [[city's]] custom and policy of deliberate indifference towards [[its employees']] safety" had been violated. *Id.* at 117, 112 S.Ct. at 1064. As to the deliberate indifference charge, the Supreme Court noted

---

**36.** The Court does believe it is important to note that in this case even if Imbert's immunity were grounded on a later prong of the *Siegert* analysis, Wardell's fate should mirror hers. *Taylor Indep. Sch. Dist.,* 15 F.3d at 455–58 makes this clear. After finding a clearly established constitutional violation, the *Taylor* court concluded that the principal of the school where the sexual abuser taught was not immune whereas the school superintendent was. It did so because the principal had been aware of the abuser's questionable conduct for a much longer period than the superintendent. *Id.* at 457. Also, the superintendent took appropriate action to investigate matters at a much earlier point in his knowledge of questions surrounding the abuser. *Id.* at 457–58. In this case, with respect to Jane Doe's rights to freedom from restraint and bodily integrity, no one disputes that

Wardell was informed in "real time." All sides agree that Imbert kept Wardell informed shortly after each incident. Wardell also participated in Jane Doe's ARD. Finally, Wardell in turn informed the school board shortly after he was informed of events. Of course, Imbert was more directly involved in restraining Jane Doe. Apart from Mrs. Doe's suggestion that Wardell was concerned about the taping of Jane Doe's mouth, however, there is simply no real indication Wardell was inclined to oppose Imbert's methods. Thus, the Court cannot conceive of any *Taylor*-like distinction in individual liability here.

**37.** Logically, she does not charge Wardell with using excessive force since he was not a direct participant in restraining Jane Doe.

that the plaintiff used the term to "characterize the city's failure to train employees in its sanitation department," and assumed such allegations were "sufficient to provide a substitute for the doctrine of *respondeat superior* as a basis for imposing liability on the city. . . ." *Id.* at 124, 112 S.Ct. at 1068. Nonetheless, the allegation of deliberate indifference did not "confront the question whether the complaint . . . alleged a constitutional violation." *Id.* Mrs. Doe cannot create a constitutional violation merely by alleging deliberate indifference from "top to bottom."

The Court has, like the United States Supreme Court in *Collins*, analyzed her complaint's allegations in the totality of the circumstances including her allegations of SS CISD's deliberate indifference to Jane Doe's alleged injuries. In *Collins*, the Supreme Court wrote that the plaintiff did not allege willful behavior and that fairly analyzed, her claim either charged that the "Federal Constitution impos[ed] a duty on a city to provide its employees with minimal levels of safety . . ." or that the city's " 'deliberate indifference' to Collins' safety was arbitrary government action that must 'shock the conscience' of federal judges." *Id.* at 126, 112 S.Ct. at 1069 (citations omitted). Here, this Court has concluded there is no constitutional right to be free of restraint in the case of a troubled child creating disturbances within a short time span in a school setting and that the use of restraints here does not shock the conscience. It has done so considering the facts as either agreed to by the parties or as sufficiently demonstrated by Mrs. Doe, including her allegations of deliberate indifference by SS CISD. Thus, SS CISD is not liable for Mrs. Doe's claims despite its failure to possess a qualified immunity defense, and the Court need not address whether Mrs. Doe has brought forth sufficient evidence that SS CISD actually caused any of Jane Doe's alleged injuries.

### 2. SS CISD's Immunity to Mrs. Doe's Tort Claims.

While SS CISD does not possess § 22.051 immunity against Mrs. Doe's tort claims against the district—intentional infliction of emotional distress and failure to meet *in loco parentis* duties, SS CISD enjoys a different immunity against those claims. Under the doctrine of sovereign immunity, Texas governmental units, including school districts, are generally not liable in tort actions. *See University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex.1994); *Williams v. Conroe Indep. Sch. Dist.*, 809 S.W.2d 954, 957 (Tex.App.—Beaumont 1991, no writ); *Duson v. Midland County Indep. Sch. Dist.*, 627 S.W.2d 428, 429 (Tex.Civ.App.—El Paso 1981, no writ) (specifically rejecting the notion that *in loco parentis* claims survive sovereign immunity); Tex. Civ. Prac. & Rem.Code Ann § 101.001 *et seq.* (Vernon 1997 & Supp. 2001).

There are exceptions to this general rule and Mrs. Doe has incorrectly argued one of them. Specifically, under Tex. Civ. Prac. & Rem.Code § 101.021:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of employment if:

 (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

 (B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE ANN § 101.021 (Vernon 1997).

Mrs. Doe argues that "the use of sheets, pins, duct tape, and cot—... school property ...—directly resulted in injury to [Jane Doe]." (Pls.' Resp. Br. Supporting Documents Defs.' Mot. Summ. J. at 18.) Mrs. Doe has not, however, dealt with another crucial statutory section. Section 101.051 of the Civil Practices and Remedies Code states that: "Except as to motor vehicles, this chapter does not apply to a school district or to a junior college district." TEX. CIV. PRAC. & REM.CODE ANN § 101.051 (Vernon 1997).

■ Texas courts hold that § 101.051 stands for the proposition that the waiver of governmental immunity provided for in TEX. CIV. PRAC. & REM.CODE § 101.001 *et seq.* is restricted to actions arising from the use of motor vehicles in cases involving school districts. *Williams,* 809 S.W.2d at 957 (citation omitted); *Cox v. Galena Park Indep. Sch. Dist.,* 895 S.W.2d 745, 748 (Tex.App.—Corpus Christi 1994, no writ). As is apparent from the facts alleged by Mrs. Doe, her claims do not stem from the use of motor vehicles. Accordingly, SS CISD has established governmental immunity against Mrs. Doe's tort claims.

### 3. Mrs. Doe's IDEA Claims Against SS CISD.

■ Finally, Mrs. Doe mysteriously and unsuccessfully alleges that SS CISD "failed to reach out and provide Jane Doe with appropriate education" and "offer her appropriate counseling and assistance." Mrs. Doe's allegations are mysterious because they do not point to any statutory basis or common law doctrine as their source. Nonetheless, the Court agrees with Defendants that these claims may not now be brought for failure to exhaust administrative remedies.

■ There is no doubt Mrs. Doe may urge her appropriate education and counseling allegations as separate grounds of liability, as more support for her federal constitutional and state tort claims or as additional claims under § 1983; her intent here is cryptic. Section 1415(b)(3)(6) of IDEA makes it apparent that IDEA may be utilized here by guaranteeing parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of [a disabled] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(3)(6) (West 2000). *Angela L. v. Pasadena Independent School District,* 918 F.2d 1188, 1193 n. 3 (5th Cir.1990) teaches that IDEA-covered claims may also be brought through § 1983. Which course Mrs. Doe takes is uncertain because she places her IDEA-covered claims after her allegations of infliction of emotional distress but in between two paragraphs alleging matters that seem to inform her federal constitutional allegations. Her summary judgment briefing offers no help either. The law of the Fifth Circuit, however, make this uncertainty unimportant.

■ The Fifth Circuit requires a plaintiff bringing IDEA-based claims to exhaust the several administrative remedies IDEA provides regardless of the channels through which IDEA-related claims are asserted. In fact, there are several administrative steps parents unhappy about the education of their disabled child may take. *See* 20 U.S.C. § 1415(b)-(i) (West 2000). The Fifth Circuit has interpreted these steps as meaning that: "[I]t is beyond

doubt that the statute provides that a plaintiff must first exhaust … administrative remedies before bringing an action in federal court … if the complaint is one falling under [§ 1415(b)(3)(6) ] . . . ." *Gardner v. Sch. Bd. of Caddo Parish,* 958 F.2d 108, 111 (5th Cir.1992).

In addition to the unimportance of what vehicle is used to bring an IDEA-covered claim, it does not appear to matter what sort of relief a parent seeks when bringing such a claim. *See Comeaux v. Tangipahoa Parish Sch. Bd.,* No. CIV. A. 00–2836, 2001 WL 175230 at *2 (E.D.La. Feb. 20, 2001) (noting that the Fifth Circuit affirmed, in a decision without a reported opinion, *Efferson v. Sch. Bd. of Caddo Parish,* 77 F.3d 478 (5th Cir.1996), an unpublished Western District of Louisiana decision that required the exhaustion of administrative remedies for an IDEA-covered claim even though the claim was filed under § 1983 and sought money damages, among other relief); *Pfeiffer v. Tangipahoa Parish Sch. Bd.,* No. CIV. A. 00–1233, 2000 WL 1725089 at *2 (E.D.La. Nov. 17, 2000) (rejecting the plaintiffs' claims that they were not required to exhaust administrative remedies for claims falling within the ambit of IDEA because they did not seek relief offered by IDEA). Thus, Mrs. Doe cannot argue (and she has not argued) that any IDEA claims she may be advancing generally do not require administrative exhaustion.

Had Mrs. Doe attempted to provide an excuse for failing to seek administrative redress, this Court might have been able to permit IDEA-covered claims to go forward at this time under whatever guise. This is so because *Gardner,* 958 F.2d at 111–12 (citation omitted), notes that " 'parents may by-pass the administrative process where exhaustion would be futile or inadequate.' " A plaintiff bears the burden, however, of demonstrating futility or inad-

equacy. *Id.* at 112 (citation omitted). Mrs. Doe has not addressed futility or inadequacy or even sufficiently hinted at either anywhere in her complaint or summary judgment briefing. In the language of *Gardner* then, "a complaint based on [§ 1415(b)(3)(6) ] is not a justiciable controversy until the plaintiff has exhausted his administrative remedies or proved that exhaustion would be futile or inadequate." *Id.* at 112. Accordingly, Mrs. Doe's IDEA claims too must be dismissed.

## IV. CONCLUSION.

Mrs. Doe's claims are not ones the Court is happy with which to have disposed. Jane Doe's story is one akin to other distressing cases appearing with increasing frequency in our society. That Jane Doe has been a victim of life from an early age is not in doubt. The Court's duty, however, has been to assess whether her mother's allegations against a school district and two educators withstand the rigors of the law. As this lengthy and considered analysis demonstrates, they do not. Mrs. Doe has not alleged a violation of rights granted by the United States Constitution against any of the Defendants. Moreover, she has failed to appropriately pursue the statutory remedies enjoyed by a disabled school child such as Jane Doe under IDEA. Finally, Mrs. Doe has not overcome the Defendants' showings of immunity against her other claims. Thus, Mrs. Doe's claims should be dismissed with prejudice.